[Civ. No. 2091. Third Appellate District.—March 4, 1920.]

In the Matter of the Estate of MILDRED L. PATTERSON, Deceased. RALPH CHARLES HENNIGAN, Respondent; H. M. PATTERSON, Appellant.

[1] HUSBAND AND WIFE—RELINQUISHMENT OF INHERITABLE INTERESTS—VALIDITY OF ORAL AGREEMENT.—A husband and wife may enter into an agreement whereby the one or the other, or both, may relinquish his or her inheritable interest in the estate of the other; and such an agreement is not required to be reduced to writing to be valid and enforceable.

[2] ESTATES OF DECEASED PERSONS—RELINQUISHMENT OF INHERITABLE INTERESTS BY HUSBAND—RIGHT TO ADMINISTER ESTATE—EVIDENCE—FINDING.—In this proceeding in which the surviving husband and a surviving son filed separate petitions asking for letters of administration upon the estate of the wife and mother, there was sufficient evidence to support the finding of the trial court that the surviving husband had entered into a valid contract with the decedent relinquishing his inheritable rights and interests in the property and estate of the latter; and, therefore, he was not entitled to administer said estate.

APPEAL from an order of the Superior Court of Butte County granting letters of administration to a surviving son and denying letters to the surviving husband. H. D. Gregory, Judge. Affirmed.

The facts are stated in the opinion of the court.

Carleton Gray and W. H. Carlin for Appellant.

Harry Davids for Respondent.

HART, J.—Ralph Charles Hennigan and H. M. Patterson filed separate petitions asking for letters of administration

upon the estate of Mildred L. Patterson, deceased. After a hearing the petition of the former was granted and that of the latter denied. The appeal is by said H. M. Patterson from the order granting letters of administration to said Hennigan and from the order denying letters to himself.

Mildred L. Patterson was formerly the wife of one Hennigan, who died in 1896 leaving five children, of whom Ralph Charles Hennigan was the oldest son. In April, 1900, she married H. M. Patterson and one son, Orval Patterson, was born to them. Mrs. Patterson was a resident of Butte County and died therein on January 27, 1919, leaving an estate consisting of real and personal property of the value of about fifteen thousand dollars, and leaving no will.

The court found: "That H. M. Patterson was not entitled to administer said estate for the reason that he was not entitled to succeed to the personal estate of Mildred L. Patterson, deceased, or some portion thereof; and that the said H. M. Patterson had, during the lifetime of the said Mildred L. Patterson, deceased, and on or about the fifteenth day of May, 1911, entered into a valid contract with the said Mildred L. Patterson, deceased, according to and by the terms of which the said H. M. Patterson relinquished, released, and waived all rights, including his inheritable rights and interests in and to the property and estate of Mildred L. Patterson, deceased."

Appellant states in his brief "that the only issue to be passed upon is whether or not the evidence sustains the court's finding to the effect that appellant had relinquished his right to inherit as an heir of his wife," and contends that said finding is not so sustained. This contention is based not alone upon the proposition that the evidence itself, assuming it to be competent, was insufficient to justify said finding, but also upon the proposition that an agreement between a husband and wife by which the one agrees to relinquish his or her inheritable interest in the other's estate cannot be shown by parol. In other words, the last stated point is that such an agreement, to be valid, must, under the terms of our statute of frauds, be reduced to writing. Upon this position the argument is advanced that the appellant is an heir of the deceased and that, therefore, he is entitled, under the provisions of section 1365 of the

Code of Civil Procedure, to letters of administration of his deceased wife's estate.

The facts of this case are: Prior to the marriage of the parties the appellant had worked on the farm of Mrs. Hennigan for two or three years. It appeared in evidence that at the time of the marriage deceased had personal property and real estate which varied in value "from a few hundred dollars probably to a couple thousand dollars," as claimed by appellant, to over twenty-one thousand dollars, as contended by respondent. The second marriage proved to be an unhappy one. According to the testimony of the respondent, appellant, soon after the marriage, began asking his wife "to put her bank account in his name so he could draw the checks." Finally she put her funds into a joint account and there was some trouble because appellant failed to fill out the stubs in the check-books when he drew money.

In January of 1901 the spouses purchased some land, a portion of which was afterward sold and, in 1903, a tract of fifty acres was purchased and held in their joint names. Shortly after the purchase of this property appellant began demanding of deceased that she deed to him one-half thereof and threatened to bring an action to compel her to do so. He began drinking heavily and would stay away from the home for two or three days at a time. In May, 1911, at the request of Mrs. Patterson, appellant, who had then been away for three or four days, came to the house to talk matters over. There were also present at that time Ralph Charles Hennigan, Robert Daniel Hennigan, another son, and Edythe Leona Beeny, a daughter of the deceased. Mrs. Patterson said that she and the children had come to the conclusion "to accede to his demands and try and bring about peace in the family in general and have a general understanding between us all, and that her chief aim was to keep a father for the boy, to avert a separation on account of the boy and save him from a drunkard's grave if she could." The result of the consultation was that Mrs. Patterson deeded to appellant twenty-five of the fifty acres standing in their joint names, he deeded the balance to her, and the bank account was divided between them. The agreement was that Mrs. Patterson should take care of her children by her first marriage and that appellant would do

the same by his son. Robert Hennigan testified that appellant said "he wanted one-half of that property in full settlement of his claims. He said he was going to have twenty-five acres of that land before· he would come there and live, and that at her death he would have no claims on her property—or our property. That was to be our property then and always, whether she should die or not, and he was to have the twenty-five acres which had the bearing orchard on it for his and Orval's part. He wanted Orval to be his sole heir. He spoke of the money in the bank at that time. He was to have no claim on the personal property whatever. . . . Mr. Patterson said he was to waive the claim to the personal property because he got the bearing half of the orchard."

Ralph C. Hennigan testified that appellant said "he wanted it fixed and a clear title to this property, so` that at his death it would go to his son alone, and that we would have no claim against it whatever, and that her part that she kept would go to us solely and that he wanted a half of it instead of waiting until her death. Q. Was there any discussion at this meeting between Mr. and Mrs. Patterson as to the children being present and their not being present? A. There was. She told him that she wanted us there, she was morally bound to have us there and take part in this agreement and division of the property, because this property that she owned had come from money left by our father from leases on land and farming opportunities left to her by our father, and that we had a right to be there and to take part in the discussion in the settlement of these property rights. It was simply and nothing else but a settlement of inheritable rights on the part of the children on both sides, he insisting that he wanted his part of this property to be so Orval would be his sole heir at his death, and that we would be her sole heirs at her death. That was his declaration there."

Other witnesses—children of Mrs. Patterson by her first husband—testified that they were present when the real property mentioned was divided, and corroborated Ralph and Robert Hennigan as to the declarations by Patterson that he would relinquish his interest in the estate of his wife, and that he did so agree.

It was further shown that, after the agreement and division of the fifty-acre tract between Patterson and his wife, one of the children of the latter by her former husband assisted in farming her land and that Patterson, after said agreement and division, never made any claim that he had any interest in her share of the property. In fact, it appears that about one year after the settlement between appellant and his wife, the former left the premises of Mrs. Patterson, and that, on the fourteenth day of January, 1919, he filed a complaint in divorce, pending which Mrs. Patterson died.

The above comprises a sufficient statement of the facts for the purposes of the decision herein.

1. That either a husband or wife may enter into any engagement or transaction with the other, or with any other person, respecting property, which either might, if unmarried, "subject, in transactions between themselves, to the general rules which control the actions of persons occupying confidential relations with each other," is expressly confirmed by sections 158, 159, and 160 of the Civil Code.

Section 159 provides: "A husband and wife cannot, by any contract with each other, alter, their legal relations, except as to property, and except that they may agree, in writing, to an immediate separation, and may make provision for the support of either of them and of their children during such separation."

Section 160 provides that the mutual consent of the parties is a sufficient consideration for such an agreement as is mentioned in section 159.

[1] It follows, of course, from said code provisions that a husband and wife may enter into an agreement whereby the one or the other, or both, may relinquish his or her inheritable interest in the estate of the other. This proposition, however, is not disputed here, nor could it be, since the disposal of one's inheritable interest in the estate of another is no less an act involving a contract or an engagement respecting property than where such act involved the transfer of property in tangible form or property having a present tangible existence. (*In re Davis*, 106 Cal. 453, 456, [39 Pac. 756]; *Wren* v. *Wren*, 100 Cal. 276, [38 Am. St. Rep. 287, 34 Pac. 775]; *Kaltschmidt* v. *Weber*, 145 Cal.

596, 599, [79 Pac. 272]; *Cullen* v. *Bisbee,* 168 Cal. 695, 698, [144 Pac. 968].)

Nor have we been able to find any provision in our law requiring that an agreement between a husband and wife whereby the one relinquishes or transfers to the other his or her inheritable interest in his or her estate shall, to be valid or of binding force, be in writing; and counsel for the appellant frankly say that, after considerable research, they have not succeeded in finding any California cases holding it to be the rule that such an engagement between husband and wife must be reduced to writing to be valid and enforceable.

Section 159 of the Civil Code, *supra,* more nearly than any other code section or law to which our attention has been directed approaches to the requirement of a writing in such agreements between husband and wife as the one involved herein. This, though, may even be stating the proposition too strongly, for it is more conservative and, indeed, more correct, to say that it is the only section specifically relating to contracts between a husband and wife respecting property, save the section as to the transfer under certain circumstances of the community property (section 172), which requires a contract between them to be in writing. But it is very clear that that section does not apply to the facts of this case. As shown, the agreement herein was not one of separation between the husband and wife. There was, in other words, no agreement between them to separate and to live apart from each other. The agreement was a part of a transaction resulting in a division between them of a certain tract of land which, it may be conceded for the purposes of this case, as counsel for appellant contend was true, they owned and held as tenants in common, and neither their agreement to divide between them said land nor the agreement whereby each relinquished his and her inheritable interest in the estate of the other contained a covenant or involved an understanding that they were thereafter to live separate and apart from each other or cease their marital relations. Section 159 of the Civil Code, so far as it requires any engagement which a husband and wife may enter into to be in writing, provides only that an agreement to an immediate separation

must be evidenced in that formal manner. There is no other matter referred to in said section, as we read it, which is required thereby to be reduced to writing except an agreement between them to an immediate separation. It is very clear, therefore, that, if section 159 is the only code section upon which appellant can rely for the support of his position that the agreement with which we are here concerned must be in writing, he is entirely without a foundation to sustain him. Nor is such an agreement within any provision of our statute of frauds, or within the fair import of any language thereof.

But we think the question has virtually been settled by our supreme court in a number of cases. (See *Kaltschmidt* v. *Weber,* 145 Cal. 596, 599, [79 Pac. 272]; *Perkins* v. *Sunset Tel. & Tel. Co.,* 155 Cal. 712, 719, [103 Pac. 190]; *Cullen* v. *Bisbee,* 168 Cal. 695, [144 Pac. 968]; see, also, *Galbraith* v. *McLean,* 84 Ill. 379; *Kershaw* v. *Kershaw,* 102 Ill. 312.)

In *Perkins* v. *Sunset etc. Co.,* Mr. Justice Melvin, speaking for the court, says: "Under our law there can be no doubt that a husband and wife may enter into a contract with respect to their property whereby one may release to the other all interest, both present and in expectancy. (*Crum* v. *O'Rear,* 132 Ill. 443, [24 N. E. 956]; *In re Davis,* 106 Cal. 453, [39 Pac. 756]; *Von Glahn* v. *Brennan,* 81 Cal. 264, [22 Pac. 596]; *Wren* v. *Wren,* 100 Cal. 279, [38 Am. St. Rep. 287, 34 Pac. 775]; *Kaltschmidt* v. *Weber,* 145 Cal. 598, [79 Pac. 272].)"

Again, in the same case, it is said: "It will be seen by an examination of the authorities cited that the utmost freedom of contract exists in California between husband and wife and *that the courts will resort to circumstantial evidence furnished by the general conduct of the spouses* with reference to their property in determining the existence or nonexistence of a contract where the exact terms of the alleged agreement have escaped the memory of one or both of the parties to it. In the case at bar there was both positive evidence and also testimony as to facts and circumstances tending to show that the contract, whereby the husband remitted to his wife all his interest in that which would ordinarily have been the community property, was and had been in existence for a long period of years."

Thus it will be observed that, while the California cases above cited and considered do not deal directly with an agreement of precisely the same character as the one here, nevertheless what is said in those cases applies with equal force to the case here, and upon the doctrine of said cases we feel persuaded that we must predicate the decision of the point under consideration here, particularly in view of the fact that, as we have shown, there is no express provision of our law requiring such agreements to be put in writing or nothing in the language of any provision of our law treating cognate subjects from which the conclusion may reasonably be deduced that the legislature intended that they should, to be enforceable, be reduced to writing.

[2] 2. We think that the evidence as received is sufficient to support the finding that the appellant agreed to relinquish his inheritable interest in the estate of the deceased, if, indeed, he ever had any such interest. We need not recapitulate the positive evidence, of which a fair conspectus is above presented herein, in support of this conclusion. It is sufficient to say that the evidence, considered together with the conduct of the parties toward each other long anterior and down to the date of the division between them of the land mentioned, and the immediate circumstances surrounding the transaction eventuating in the division, appear clearly enough to be sufficient to have warranted the conclusion arrived at by the trial court, as evidenced by its findings, that an agreement was made by the appellant, as a part of the transaction resulting in the division of the land, that he would forever waive or relinquish any inheritable claim to or interest in the estate of the deceased. What appeared to be uppermost in his mind, in insisting on a division of the land, was the future welfare of his own son by deceased, he repeatedly saying that he wanted it understood that, upon his death, his share of the land should go to said son solely and that the children of deceased by her former marriage should not receive, upon his death, any part of his estate or of the land which he received by the division. The fact that he left the deceased about a year after the division of the land was effected and the fact that he brought suit for divorce against the deceased and in the complaint in said action, the record

of which is in evidence here, he made no claim of any interest in the deceased's estate, merely referring to the fact of the division of the land and describing both parcels and alleging that each parcel so described was the sole and separate property of each spouse, were circumstances which the trial court could well have considered, and no doubt did consider, as tending to strengthen and support the positive evidence that the appellant, at the time the tract of fifty acres was divided between him and the deceased, agreed to relinquish his inheritable interest in the estate of the deceased. Then there is some evidence tending to show that all the property of the deceased, including the money appropriated to the purchase of the tract taken and held in the joint names of the appellant and the deceased—the tract divided between them—was inherited in part by the deceased from her former deceased husband, the father of respondent, and partly acquired as of her community right in the estate of her former husband. This evidence might well be held to tend in some measure to support the claim of respondent that an agreement to relinquish his inheritable interest in the estate was made by appellant, since, considering the probabilities of such a situation, if it in fact existed (and it was for the trial court to determine whether it did exist), the court below could well have concluded or inferred therefrom that the appellant would readily assent to a waiver of a claim to any interest in property or an estate in which he in fact had no actual interest. In addition to the foregoing, we may call attention to the appellant's testimony, which would seem to go far toward confirming the claim that he did agree to surrender or relinquish any inheritable interest he might set up in his wife's estate. He testified: "I had this conversation about inheritable rights with my wife probably six months after we separated. It took place on a bench in the city park in Chico and I told her that unless she agreed to sign such paper I was afraid I would have to get a divorce, and it was probably six months afterward that she finally told me she would not sign. This last conversation we had somewhere along in 1913. I don't remember the exact date and the conversation was started by myself, because I wished to have the inheritable rights in both families ab-

solutely settled in case of her death or my death, so there would be no come-back from either branch of the family, and that was my idea all along. I had that idea in my mind at the time of the division of the property.''

We may also refer to the further testimony of the appellant that he had approximately one thousand six hundred dollars when he and the deceased intermarried, in April, 1900, and that the land they bought and took in their joint names and subsequently divided between themselves was ''worth probably twelve or fifteen thousand dollars.''

From the foregoing consideration of the evidence, both positive or direct and circumstantial, we think we are perfectly safe in the conclusion that the finding that the appellant agreed to surrender any inheritable right or interest he might have or claim or put forth in the estate of the deceased derives sufficient support from the evidence. At any rate, we cannot say, as a matter of law, that said finding is not sufficiently supported. And we are constrained to add that, all the facts and circumstances of the case considered, the conclusion of the trial court in that particular and the order following therefrom granting letters of administration to a son of the deceased are not alone legally well grounded but involve a disposition of the controversy in harmony with the principles of abstract justice.

The order is affirmed.

Ellison, P. J., pro tem., and Burnett, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on May 3, 1920.

Angellotti, C. J., Lawlor, J., Lennon, J., and Olney, J., concurred.