[Civ. No. 6911. First Appellate District, Division One.—April 21, 1930.]

AMERIQUE B. FITCH, Respondent, v. MARY F. TYLER, as Administratrix, etc., Appellant.

Thomas, Beedy, Presley & Paramore for Appellant.

T. C. Van Ness, Jr., and Leo J. McEnerney for Respondent.

McKENZIE, J., *pro tem.*—This is an appeal by defendant from a judgment against the estate of her testate, George Hamlin Fitch, said judgment being based on an alleged separation agreement entered into by plaintiff and decedent during his lifetime.

Respondent and Fitch were married by a justice of the peace at Fairfield, Solano County, on the seventh day of June, 1912. At the date of marriage plaintiff was thirty-six years of age and had two daughters by a former marriage, one of whom was between thirteen and fourteen years of age; the age of the other girl is not shown.

In September, 1912, Fitch and his wife were having marital difficulties, the nature of which, other than Fitch's statement that he was disappointed, does not appear. Mrs. Fitch consulted James M. Hanley, an attorney, who wrote to Fitch concerning the matter and the letter brought a reply from James

F. Lanagan, an attorney who represented Mr. Fitch. Fitch being dead and Mrs. Fitch not being competent to testify under the provisions of subdivision 3, section 1880, of the Code of Civil Procedure, Mr. Hanley appears to have been the only available person who had knowledge of the negotiations that led up to the writing hereinafter referred to and which is the foundation upon which plaintiff's case rests. Mr. Hanley's testimony is brief and amounts to this: That he discussed the matter with Mr. Lanagan, at Lanagan's office, three times and that on one occasion Mr. Fitch was present; that he proposed to Lanagan and Fitch that they draw up a property settlement agreement giving Mrs. Fitch a monthly allowance for support of $250 per month; that Fitch said he would pay her $150 per month and no more and that if she would not take that he would go beyond the jurisdiction and pay nothing; that Fitch said he would start paying immediately and would continue as long as he lived; that after this Mr. and Mrs. Fitch then fixed the matter up without the aid of either lawyer and that a few days later Mrs. Fitch brought him the following letter: "Enclosed you will find check for $150 for your separate maintenance for October. Hereafter I will send a similar check on the first of each month, yours sincerely, George H. Fitch"; that Mrs. Fitch told him that Fitch would not sign any other paper, and that a few days later he met Mr. Lanagan and told him, "I think our clients have got together, they have agreed and I guess there is nothing else to do, it is just as good in his writing as if we had written it and if it is acceptable to her and she has taken the money, I suppose that is all right, and I let it go at that."

The evidence shows clearly that the foregoing letter with a check for $150 inclosed was received through the mail by Mrs. Fitch on October 4, 1912, and that she received a similar letter and check for like amount for a while and then for $170 from Mr. Fitch about the first of every month until and including the first day of May, 1915—a period of two years and eight months. These checks were all accepted and cashed by Mrs. Fitch. From October 3, 1912, to the end Mr. and Mrs. Fitch did not live together nor communicate with each other except by means of the stereotyped letters accompanied by a check which he sent her every month until May 1, 1915, when he ceased making payments.

In the early part of 1915 Fitch went to New York, remained there a few months; went to Europe for a few months; returned to United States and resided in New York and Florida until 1920, when he returned to California, and resided in the vicinity of Los Angeles until his death on the twenty-fifth day of January, 1925.

May 6, 1919, Mrs. Fitch commenced in San Francisco an action for divorce against Mr. Fitch, charging him with having deserted her on the third day of October, 1912. The complaint, which was verified by Mrs. Fitch, makes no mention of the contract involved in this action nor of any agreement concerning property or maintenance agreements. The prayer of the complaint asked for "general relief." Mr. Lanagan, as attorney for defendant, filed an answer denying the desertion. The answer has attached to it Fitch's written authorization for Lanagan to appear for him. An interlocutory and final decree followed in due course on the twenty-eighth day of May, 1920.

Mr. Fitch died January 25, 1925, and letters of administration with the will annexed were issued to defendant, who is a daughter of deceased. In August, 1925, plaintiff presented to defendant for allowance her claim against the estate; the claim was disallowed and this suit followed.

In considering this case we must differentiate the facts in this case with those in *Estate of Patterson*, 46 Cal. App. 415 [189 Pac. 483], wherein it was held a contract between husband and wife concerning property is not required to be in writing. The exception contained in section 159 of the Civil Code is noted in that case. In the instant case plaintiff pleaded a separation agreement and she is bound by her pleading. In considering this case in the light of the respective briefs, we are not fully enlightened concerning the law because counsel for respondent assumes, without authority or argument, that at all times since October 3, 1912, there existed a valid and binding obligation on the part of Mr. Fitch to pay Mrs. Fitch $150 per month so long as he should live. If this be true, some of the arguments of counsel for appellant are not in point, because as regards separation agreements the general rule appears to be that the parties to such an agreement can do almost anything they please providing they do what they agreed to do and do nothing they agreed not to do.

The all-important allegation of the complaint reads as follows: "That on or about the 3d day of October, 1912, said plaintiff and the said George Hamlin Fitch entered into an agreement to live separate and apart from each other, and at said time, in the City and County of San Francisco, State of California, the said George Hamlin Fitch agreed in writing to pay to the plaintiff the sum of $150.00 per month as and for separate maintenance and to pay the said sum of $150.00 per month to the said plaintiff for and during the term of her natural life; said sum being payable, according to the terms of said agreement on the first day of each and every month from and after the date of said agreement." The defendant denied this allegation and during the trial strenuously objected to the introduction in evidence of the letter in question and likewise objected to the oral testimony of Mr. Hanley. The court found this allegation of the complaint to be true. Judgment was awarded plaintiff for monthly payments and interest thereon during the four years preceding the death of Mr. Fitch. The judgment was entered January 4, 1929, and is for the recovery of $7,200 principal and $3,990.50 interest. Defendant appeals and urges several grounds for reversal. Several of the grounds for reversal advanced by her cannot be intelligently considered until it is determined first: Did the parties make any valid and binding contract? And, second: If a valid contract was entered into, was it to continue until the death of one of the parties or was it one that could be terminated at any time? If there was not a valid contract or if there was a valid contract which was terminated when Fitch ceased making payments or when Mrs. Fitch secured a divorce, the trial court was not justified in rendering judgment for plaintiff.

The laws of this state sanction husband and wife making contracts respecting property. (Sec. 158, Civ. Code.) They may likewise agree, in writing, to a separation and make provision for the support of either during such separation. (Sec. 159, Civ. Code.) It is almost a universal rule that separation agreements provide not only for maintenance, but likewise settle and determine the property rights of the parties both as to the present and future; but it is not essential to the validity of a separation

agreement that the property right or inheritance rights of the parties are or are not disposed of. In such agreements property rights may be excluded entirely or they may be included in whole or in part. (*Jones* v. *Lamont,* 118 Cal. 499 [62 Am. St. Rep. 251, 50 Pac. 766]; *Wickersham* v. *Comerford,* 96 Cal. 433 [31 Pac. 358].)

■ Statutory requirements as to the execution of separation agreements must be complied with. (9 R. C. L., p. 527.)

■ Our statute requires that separation agreements must be in writing, which implies that the agreement must not only be in writing, but also that the writing must be signed by both parties. ■ In the instant case there was not an agreement in writing, unless the letter sent with the check constituted an agreement which was signed by Mr. Fitch, but Mrs. Fitch never signed any agreement. It is clear that the parties, with the aid of their respective attorneys, were negotiating in regard to a property settlement and separation agreement. According to the testimony of Mr. Hanley, the negotiations included "obtaining maintenance and support from Mr. Fitch," "to discuss the domestic relations of Mr. and Mrs. Fitch," "to adjusting and to arrive at a property settlement agreement between Mr. and Mrs. Fitch." Mr. and Mrs. Fitch abandoned their respective attorneys and undoubtedly made some sort of an agreement themselves. What was this agreement? It is not in writing, and how could it be proven by previous negotiations between the attorneys alone? Conceding that Mr. Fitch did say at one time previous to his final agreement with Mrs. Fitch that he would pay $150 per month so long as he lived, how can it be determined that was the final agreement? After the parties had made their agreement, Mr. Fitch did not make any statement to Mr. Hanley or to anyone else concerning the terms of the agreement he and Mrs. Fitch had entered into, except by and through the letter in question. This leaves plaintiff with the letter and the facts that subsequently developed to establish her case by. This letter reads as follows:

"San Francisco, Cal. Oct. 3rd, 1912.

"My dear Amerique: Enclosed you will find check for $150.00 for your separate maintenance for October. Hereafter, I will send a similar check on the first of each month.

"Yours sincerely,

"GEORGE H. FITCH."

The case of *Carl* v. *Carl*, (Sup. Ct.) 166 N. Y. Supp. 961, involved a separation agreement which contained a clause relating to duration of payment almost identical with the one under consideration. It reads as follows: "The party of the first part agrees to give to the party of the second part the sum of $5 per week for the support and maintenance of the said party of the second part, payment to be made each Monday, and commencing with the date of this agreement, payment to be made by post office order to the party of the second part." The husband ceased paying and the wife brought suit to collect installments. The lower court held that the contract contemplated a permanent separation. The upper court in reversing the judgment said: "It will be noted that this contract does not, in specific terms, say how long it shall continue in force. Is it to have any greater force than ordinary commercial agreements (such as contracts for hiring), which may be terminated at any time when no fixed term is stated? We think not."

The reasoning and the ruling in *Carl* v. *Carl* is to the effect that the terms used in the letter in question imply that the agreement may be terminated at any time. "The law enters, as a silent factor, into every contract. That which is implied by law becomes a part of the written contract, the same, in general, as if it were written therein, and if the contract is thus made clear and complete it can no more be varied or contradicted by parol evidence as to the matter imported into it by law than it can in any other respect." (2 Elliott on Contracts, sec. 1628.) Having in mind that the letter in question relates to a separation agreement and viewing it in the light of the way it was made and the purpose of the maker (or makers, although Mrs. Fitch signed nothing), we conclude that the terms of the letter implied that it was revocable at any time, and that this legal implication could not be varied by parol evidence. It then follows that the trial court was in error in allowing the introduction of parol testimony to prove how long the payments were to continue.

Having determined the agreement, such as it was, could be terminated at any time, we are of the opinion that it was terminated by Fitch when he ceased making payments and that this termination was acquiesced in by

Mrs. Fitch. Mr. Fitch stopped making payments in May, 1915, and no complaint was filed to recover on this agreement until Fitch died. In 1919 she filed in San Francisco a complaint seeking a decree of divorce. Mr. Fitch appeared in this action by his attorney, Mr. Lanagan, who was authorized in writing to so appear; nothing was said in the complaint about a separation agreement or any money due thereon, nor after Mr. Fitch appeared in the action was an amended complaint filed so that she could recover the $7,200 that was then due her, if there had been a valid agreement in existence. True, there is some testimony in the record that Fitch disappeared and could not be found, but it is not at all convincing or entitled to serious consideration considering that her claim, if she had any, amounted to more than $18,000 at the time Mr. Fitch died. Mrs. Fitch knew that Mr. Lanagan was his lawyer, yet no inquiry was made of him. Furthermore, a man who for years had held an important position with a great metropolitan newspaper and could write books and sell them could be easily found by one who was his creditor to the extent of thousands of dollars. If Mrs. Fitch had not secured a divorce or if Mr. Fitch had not left a will disposing of his separate property, the facts herein might have furnished a different theme.

If the rule laid down in *Carl* v. *Carl, supra,* is not followed and we were to hold that the duration of the agreement in question could be established by parol, we would have to rely on the frail memory of man to go back many years to determine if the term was during Mrs. Fitch's life, or during Mr. Fitch's life, or during a term when the husband's income was so much, or during the term Mrs. Fitch's daughters were too young to go to work, which last condition might be fairly inferred from the whole record. The last payment in 1915 was evidently made after Fitch left San Francisco, because it was made through the office of his attorney, Mr. Lanagan. Mrs. Cupples, plaintiff's daughter, testified as a witness and while testifying concerning the last check that came through Mr. Lanagan's office she said it was fixed in her mind because ''I was forced to go to work.'' At that time no one knew Mr. Fitch was going to repudiate any agreement made by him. Furthermore, the later checks sent by Mr. Fitch were for

$170 instead of $150. It is fair to assume that the total amount paid by Fitch was $5,000—a significant figure, and the addition of $20 to the later checks is inconsistent with the character of a man, more or less prominent, who would obscure himself to avoid his financial obligations.

These observations are not prompted by the thought that they have anything to do with the findings of the trial court or that they have anything to do with our determination of this case, other than to emphasize the importance of having all the essentials of separation agreements reduced to writing and signed by both parties as the law provides. Mrs. Fitch did not sign any agreement and the mere acceptance of money would probably not have bound her. If in such a case one was attempting to bind her, and parol testimony was admitted to explain under what circumstances she took the money, confusion would result.

The exigencies of business and commerce, where at every place at all times people are engaged in everyday business affairs, demand that laws should be flexible and not too exacting; but there is no need for informal rules when applied to separation agreements, and as proof of this we fail to find in any of the law books reference to a case where the agreement has not been signed by both parties; neither have we found a case where an attempt has been made to establish such a claim by a letter which at most only relates to some previous agreement, nor have we found, in the reports of the states where such agreements must be in writing, any instance of where the terms of such an agreement were established by parol evidence.

The law regards with great caution all stale demands made against a decedent's estate. In this case the lips of the parties to the transaction involved herein are closed; one by death and the other by law. Both were presumed to know that the law required such agreements to be in writing and signed. This requirement they did not comply with; consequently the court must consider the legal rights of plaintiff and *all those* interested in the estate from the position the plaintiff and decedent placed themselves in. It is of no moment that in this particular case the ruling of the court might or might not be of advantage to either side. This seems to be a case of first impression and the

rule announced at this time ought to establish a precedent that will tend to avoid rather than create confusion. Separation agreements are seldom made and there never can be necessity for haste, and there seems to be no good reason why they should not comply with the strict requirements that the statute provides.

We therefore hold, first, that the letter in question did not constitute a valid and binding obligation for the reason that it does not contain an agreement to live separate and apart; that it lacks mutuality and that it was not signed by both parties; and, second, that the promise or agreement contained in the letter to pay $150 per month was one that could be abrogated at any time by either of the parties and that it was abrogated.

Judgment reversed and the trial court is directed to enter judgment in favor of defendant.

Tyler, P. J., and Cashin, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on May 21, 1930, and a petition by respondent to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on June 19, 1930.