Beatrice Aronow v. Commissioner.
Aronow v. Commissioner
Docket No. 3991-64.
United States Tax Court
T.C. Memo 1970-246; 1970 Tax Ct. Memo LEXIS 108; 29 T.C.M. (CCH) 1079; T.C.M. (RIA) 70246; August 31, 1970, Filed Peter R. Stoll, Suite 200 Roosevelt Bldg., 727 West Seventh St.,Los Angeles, Calif., for the petitioner. Allan D. Teplinsky and Marion Malone, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined a deficiency in petitioner's income tax for the calendar year 1952 in the amount of $111,943.46 and additions to tax under section 293(b), I.R.C. 1939 and section 294 (d)(2), I.R.C. 1939, in the amounts of $55,971.73 and $6,686.61, respectively. By amendment to answer filed at the trial respondent alleged that he erred in determining these deficiencies on the basis of petitioner's joint and *109 several liability with her husband, but that there is a deficiency in petitioner's income tax for the calendar year 1952 because of her individual liability for her half of the community income of herself and her husband in the amount of $56,118.41 and additions to tax under section 291, I.R.C. 1939, and section 294 (d)(2), I.R.C. 1939, in the amounts of $14,029.60 and $3,367.10, respectively. The issues for decision are: (1) Whether one-half of the income received by petitioner's husband in 1952 from a liquidation dividend and gain from the sale of certain stock was community income under the laws of the State of California so that one-half thereof is taxable to petitioner. (2) Whether petitioner's failure to file a Federal income tax return for the taxable year 1952 was due to reasonable cause. (3) Whether petitioner is liable for an estimated tax penalty for the year 1952. Findings of Fact Some of the facts have been stipulated and are found accordingly. 1080 Petitioner, an individual who resided in Beverly Hills, California at the time of the filing of the petition in this case, did not file either an individual Federal income tax return or a joint Federal income *110 tax return with her husband for the taxable year 1952. A Federal income tax return was filed by petitioner's former husband, Max Stettner (hereinafter referred to as Stettner) for the taxable year 1952 with the district director of internal revenue for the District of Lower Manhattan. Although this return, in addition to the signature of Max Stettner, bore the following signature, "Beatrice Stettner by Max Stettner," the return was the individual return of Max Stettner and did not constitute a joint return of Max Stettner and petitioner. On September 22, 1952, Stettner received a dividend from the liquidation sale of the 6001 Corporation in the amount of $80,077.90. He received gain in the amount of $60,953.18 from a total of four sales of stock of Pacific Mercury Television Manufacturing Corporation (hereinafter referred to as Pacific Mercury), one of such sales being on April 30, 1952, to Samuel Reisman, one on June 24, 1952, to Walston and Company, one on July 7, 1952, to Merrill, Lynch, Pierce, and the fourth one on July 21, 1952, to Sears, Roebuck & Co. In addition Stettner received gain during the year 1952 in the amount of $77,623.50 from miscellaneous sales of stock of Pacific *111 Mercury on various dates from February 14, 1952, through November 13, 1952. Petitioner and Stettner had been married for 17 years prior to 1950 when they separated. Later in 1950 they again commenced to live together as husband and wife. In the latter part of 1951 petitioner and Stettner separated and never again lived together as husband and wife. In January or early February of 1952, after their finall separation, petitioner and Stettner decided that they would never again live together and would attempt to obtain a divorce. At that time they made an oral agreement to settle their community property interests. They agreel that petitioner would receive $25,000 in cash, a 1950 Buick automobile, all household furniture, furnishings, and effects, except Stettner's personal clothing and effects, and all of her personal clothing and other effects. Stettner was at that time supporting petitioner and their two chillren. They agreed that he would continue to do so, giving her $800 a month, $300 of which would be for support of the two children. They further agreed that all of their other community property would be Stettner's property and he would be responsible for all community debts *112 which they had incurred. They further agreed that their oral agreement would be put into writing and offered to the court for approval in connection with petitioner's obtaining a divorce from Stettner. Sometime after reaching the oral agreement, petitioner and Stettner went to an attorney, told him of their agreement, and asked him to draft a written agreement containing the substance of their oral agreement. On December 15, 1952, petitioner and Stettner executed a written agreement which had been drafted by their attorney. The agreement provided that petitioner should receive and retain as her sole and separate property $25,000 in cash, a 1950 Buick automobile, all household furniture, furnishings and effects, except Stettner's personal clothing and effects, and all of her personal wearing apparel, jewelry, furs, and other personal effects. It provided that there was awarded to Stettner free and clear from any and all right, title and claim of petitioner, 10,000 shares of stock of Pacific Mercury, a 1951 Cadillac convertible automobile, all of his right, title and interest in and to a partnership existing between Stettner and another, all his personal wearing apparel, jewelry *113 and other effects, and all other cash or property in his possession. This agreement further provided that Stettner would pay to petitioner "as a further division of their property and in lieu of alimony until such time as she shall die or remarry" the sum of $500 per month, payable on the first day of the month, and that he would pay to her $150 per month as support for each of the children until such child became 21 years of age, died, or married. The agreement further provided for Stettner's maintaining life insurance payable to petitioner as well as providing for petitioner's custody of the children and Stettner's visitation rights. The agreement of December 15, 1952, contained in addition the following provision: 2. Indemnification and Payment of Income Taxes. * * * Husband does hereby warrant and covenant that there are no debts contracted by him for which the Wife is or may become liable, excepting, 1081 however, the Husband does acknowledge that there is a very substantial obligation to the United States Government and to the State of California for income taxes, by virtue of the sale by the Husband of all of his right, title and interest in stock owned by him in Pacific *114 Mercury Television Mfg. Corp., a corporation, and Six Thousand One Corporation, a California corporation. Husband further agrees, whether separate returns shall be filed or a joint return, that the entire tax liability of both Husband and Wife shall be paid by the Husband. * * * * * * 9. Subsequently Acquired Property. * * * from the date hereof all property standing in the name of either party or under his or her control shall be deemed and considered as his or her sole and separate property and estate. 10. Payment of Attorney Fees. Husband does hereby agree to pay to Buchalter, Nemer & Fields all attorneys' fees, together with court costs incurred or which may be incurred in any action for divorce that may hereafter be instituted, and for the preparation of this agreement. * * * 12. Approval by Court. It is mutually agreed that in the event either party hereto shall apply or sue for a divorce, then and in such event this agreement may be offered by said parties, or either of them, to said Court for approval. * * * 15. Entire Agreement of Parties. Each of the parties hereto represents that the within instrument constitutes the entire agreement of the parties hereto; that *115 there are no outstanding agreements between the parties with reference to the matters herein contained; and that no promises or inducements have been made to either party by the other to induce them to execute the within agreement. Each of the parties admits that he or she has read and is familiar with the contents of this agreement and is satisfied therewith. On January 6, 1953, petitioner was granted an interlocutory judgment of divorce from Stettner. This divorce decree incorporated the provisions of the agreement between petitioner and Stettner executed on December 15, 1952. The same attorney represented both petitioner and Stettner in their divorce action, and he was the same attorney to whom they had gone to have their property settlement agreement drafted. On January 14, 1954, a final judgment of divorce of petitioner from Stettner was entered by the Superior Court of the State of California in and for the County of Los Angeles, which judgment again approved the property settlement agreement which had been approved in the interlocutory decree. The stock of Pacific Mercury which Stettner sold on April 30, 1952, to Samuel Reisman was paid for by a check in the amount of *116 $8,750 drawn to the order of Stettner and petitioner. This check was endorsed by petitioner at Stettner's request, but she received none of the proceeds from the check. Petitioner endorsed a check in the amount of $112,000 dated July 21, 1952, drawn to the order of the attorney who was representing petitioner and Stettner in the divorce proceedings and Samuel Reisman as Escrow Holders by Sears, Roebuck and Company. The check had been endorsed by the attorney and Samuel Reisman, "Pay to the order of Max Stettner and Beatrice Stettner." Petitioner received none of the proceeds from this check. Petitioner also endorsed a check dated August 29, 1952, drawn to the order of Max Stettner and Beatrice Stettner by the Title Insurance and Trust Company in the amount of $213,580.15. Petitioner received none of the proceeds from this check. Petitioner received the $25,000 in cash called for in the agreement of December 15, 1952, from her attorney about the time of the entry of the interlocutory divorce decree or shortly before the entry of that decree. The value of the other property received by petitioner under the agreement received by petitioner under the agreement of December 15, 1952, was *117 approximately $25,000. This property was in petitioner's possession from the time of her separation from Stettner. Other than the monthly payments called for in the agreement, petitioner received no other property from her settlement with Stettner. Petitioner was unwilling to execute the written agreement until Stettner could pay her the $25,000 called for therein. This fact plus the fact that Stettner was away from California for a substantial portion of the year 1952 and the delay of the attorney in drafting the agreement was the reason why the oral agreement between petitioner and Stettner was not reduced to writing prior to December 15, 1952. Petitioner had no knowledge of the extent of the property which she and her husband held as community property. She was told by her husband that there were substantial community debts and that the moneys received from the checks she endorsed would be used primarily to pay those debts. 1082 Stettner was indicted, and on a plea of nolo contendere, convicted of knowingly attempting to evade income tax for the taxable year 1952. Respondent on June 17, 1964, sent by certified mail to "Mr. Max Stettner and Mrs. Beatrice Aronow (formerly *118 Mrs. Beatrice Stettner)" a notice of deficiency, determining an income tax deficiency and an addition to tax for the year 1952 in the amounts heretofore set forth. In this determination respondent stated that it had been determined that the return filed for the taxable year 1952 "is a joint return of husband and wife, and that the tax liability thereunder is joint and several." Stettner filed a separate petition from that of petitioner herein and at some time prior to the trial of this case stipulated the deficiencies as determined by respondent subject to the acceptance of an offer in compromise by respondent, which offer in compromise was accepted and the stipulation of deficiency filed with this Court. Respondent in his amendment to answer filed at the trial admitted the allegations of error contained in the petition insofar as they alleged error in his determining that the return filed by Stettner for the taxable year 1952 was a joint return of Stettner and petitioner, that the liability based on the return filed by Stettner for the taxable year 1952 is joint and several among Stettner and petitioner, and that petitioner is liable for the addition to tax for fraud. Respondent *119 in this amendment to answer alleged that, "Based on facts learned subsequent to the issuance of the statutory notice of deficiency and answer" the return filed by Stettner for the taxable year 1952 did not constitute a joint return with petitioner, that the unreported income as set forth in the statutory notice of deficiency represented community taxable income to petitioner and her husband, one-half of which should have been reported by petitioner, that petitioner failed to file an individual income tax return for the taxable year 1952, and that petitioner is liable for the tax on her share of the unreported community income and additions to tax for failure to file a return and for substantial underestimation of estimated tax. Opinion Both parties recognize that Stettner received income during the taxable year 1952 while he and petitioner were still husband and wife. [1]
*120 Respondent takes the position that since under the provisions of section 164, Cal. Civil Code (West 1954), [2] there exists the presumption that property acquired by either husband or wife after marriage is community property, there exists a presumption in this case that the property sold by Stettner from which the gains here involved were realized, constituted community income. *121 While there is no showing in the record in this case as to when or with what funds 1083 Stettner's interest in the 6001 Corporation or the Pacific Mercury stock was acquired, petitioner apparently does not contest that these properties were at one point community property. Petitioner relies on her contention that she and Stettner, prior to the time of the liquidation of 6001 Corporation and the sale of the Pacific Mercury stock, entered into an oral agreement that these assets were the separate properties of Stettner. Both petitioner and respondent recognize that the law of California is that spouses can by oral agreement change community property to separate property or vice versa. Katz v. United States, 382 F. 2d 723, 729 (C.A. 9, 1967), and Huber v. Huber, 27 Calif. 2d 784, 167 P. 2d 708 (1946). [3]
*122 Petitioner relies on her testimony and that of Stettner that they did in the latter part of January or early part of February 1952, before any of the transactions giving rise to the income here in issue occurred, separate their community property into separate property by oral agreement. Respondent contends that under all of the circumstances of this case we should not accept the testimony of petitioner and Stettner. He points to the length of time between the claimed oral agreement and the written agreement which was signed December 15, 1952. He likewise relies on certain provisions in the agreement of December 15, 1952, which he contends are in conflict with the existence of a prior oral agreement and on the fact that the checks received for certain of the sales of stock were made out to Stettner and petitioner. Respondent points to certain inconsistencies in petitioner's testimony such as her original statement that she had not known about the sales of stock by Stettner and her later statement that she must have known about the stock sales at the time she endorsed the check and he made the statement to her that the proceeds would be consumed in payment of debts. Respondent argues *123 that the allegation in the petition in this case which was verified by petitioner that, "Prior to the divorce proceedings, a Property Settlement Agreement was entered into between petitioner and Stettner on December 15, 1952," is in conflict with petitioner's testimony that an oral agreement had been entered into by the first part of February 1952. Respondent further contends that the fact that petitioner would take $25,000 in cash and property of a value of approximately $25,000 as her half of the community property creates an inference that the division was after the dissolution of the 6001 Corporation and the sale of the Pacific Mercury stock. While there are some statements in the agreement of December 15, 1952, that might technically be in conflict with a pre-existing agreement separating the community property of petitioner and Stettner into separate property, we do not view these conflicts to be of such a nature as to be totally inconsistent with the existence of a prior agreement between the parties. There are some inferences in the record of the existence of such an agreement. The parties had finally separated and intended to obtain a divorce. If Stettner was contemplating *124 liquidation of the 6001 Corporation and disposition of his stock in Pacific Mercury, it would be logical for the parties to reach some agreement as 1084 to their respective property rights prior to the consummation of these transactions. While it might seem reasonable that petitioner would demand her $25,000 in cash at the time she endorsed the checks received in payment for Pacific Mercury stock, she explained her failure to do so with the statement that Stettner was "taking care of all living expenses plus giving me an allowance" and "we had a lot of community debts at the time that Mr. Stettner had amassed, and he told me that there would be very little left, if any, from these checks." Considering the testimony as a whole and the firm. statements of both petitioner and Stettner that they had made on oral agreement as to a division of property in late January or early February 1952, we conclude that the weight of the evidence is that the parties had made such an agreement. It is clear that the reference to the sale of stock having been made which is contained in the written agreement could not have been part of an oral agreement made prior to the sale. However, this addition *125 by the time the agreement was reduced to writing in no way invalidates the existence of a prior oral agreement that the stock was the separate property of Stettner. Under California law an existing oral agreement between spouses as to the nature of their property is valid even though it is understood at the time it is made that they will execute a written agreement. Hotle v. Miller, 51 Calif. 2d 541, 334 P. 2d 849 (1959). In Hotle v. Miller, the court held that where the written agreement drafted by an attorney differed from the oral agreement of the spouses, the written agreement could be reformed if it were shown that there was mutual mistake in these changed provisions. Petitioner in her brief contends that her oral agreement with Stettner was "executed" in that both parties received the consideration to be received and performed all that they promised in their oral agreement of early 1952 to perform, and therefore if an "executed" oral agreement is required by California law to change the nature of a spouse's interest in property, we should hold that the agreement between petitioner and Stettner was "executed." In our view for the agreement to be "executed," it would *126 at a minimum be necessary to show that petitioner had been paid her $25,000. The evidence here shows that this had not been done at the time of the disposition of the property that produced the income here involved. In Huber v. Huber, (167 P. 2d at 711), the Court referred to certain California cases that "merely held that husband and wife may by written or executed oral agreement change the character of their property." In In re Wieling's Estate, 223 P. 2d 55 (1950), in referring to the Huber case, the Court stated at p. 58: Following the Tomaier case the Supreme Court reaffirmed the rule in Huber v. Huber, 27 Cal. 2d 784, 167 P. 2d 708, stating that, "an oral agreement to convert property into community property may be established", 27 Cal. 2d at page 788, 167 P. 2d at page 711, and that cited cases held "that husband and wife may be [sic] written or executed oral agreement change the character of their property." 27 Cal. 2d at page 789, 167 P. 2d at page 711. If the rule depends upon proof of an "executed" oral agreement it is not applicable here because the undisputed evidence is that all the properties acquired *127 after the purported agreement were purchased solely with the funds of the wife derived from the proceeds of insurance upon her deceased son. Furthermore the evidence is undisputed that, following the purported agreement, properties were not purchased by either spouse to complete respondent's version of the oral contract that each party should have as his separate property an equal share of the whole. If the rule of the cases cited is that husband and wife may change the character of their community real property by an executed oral agreement then the respondent has failed to prove his case and the judgment should be reversed. But there are so many authorities cited with approval in the Tomaier and Huber cases which do not limit the rule to one of an executed oral agreement that we are compelled to hold that the more elastic interpretation applies here. Numerous California cases, as pointed out in the above quotation, do refer to an oral agreement between spouses being sufficient to change the nature of their separate property to community property or their community property to separate property. We therefore conclude that even though the $25,000 was not paid to petitioner until *128 the signing of the written agreement, their oral agreement to change the nature of their property could under California Law change the nature of their property. Respondent contends that petitioner's proof should be considered insufficient since she did not call the attorney who drafted the written agreement as a witness. Petitioner 1085 testified and her former husband testified as to their agreement. The issue here was raised by respondent by an amendment to answer filed at the trial. There is no reason shown in the record why respondent could not have called the attorney as his witness if he questioned the veracity of petitioner and Stettner. There are some conflicts in the evidence in this case, but both petitioner and Stettner unequivocally testified to the oral agreement. We conclude from all the evidence that the weight is with petitioner that the properties, the disposition of which gave rise to the income here involved, had become the separate property of Stettner prior to the time they were disposed of. Based on this conclusion we hold that petitioner had no taxable income for the calendar year 1952 and therefore do not reach the other issues in this case. [4]
*129 Decision will be entered for petitioner. Footnotes
1. The parties stipulated as follows: It is agreed by the parties that the dividend from the liquidation sale of the 6001 Corporation in the amount of $80,077.90 and the gain from the sale of Pacific Mercury Corp. stock in the amount of $60,953.18 represented taxable income earned by Max Stettner during the taxable year 1952. Petitioner in her original brief questioned the $77,623.50 gain from miscellaneous sales of stock of Pacific Mercury. However, in her reply brief she made no objection to respondent's requested finding that Stettner received taxable income during the year 1952 in the following amounts and from the following sources, one of which sources was the $77,623.50 gain from miscellaneous sales of Pacific Mercury stock. We, therefore, assume that petitioner no longer contests the fact that Stettner had such income. In any event the weight of the evidence supports respondent's position that Stettner did make these miscellaneous sales with the gain indicated.↩
2. Cal. Civil Code, Sec. 164. Community property; presumptions as to property acquired by wife; limitation of actions. All other property acquired after marriage by either husband or wife, or both, including real property situated in this State and personal property wherever situated, heretofore or hereafter acquired while domiciled elsewhere, which would not have been the separate property of either if acquired while domiciled in this State, is community property; but whenever any real or personal property, or any interest therein or encumbrance thereon, is acquired by a married woman by an instrument in writing, the presumption is that the same is her separate property, and if acquired by such married woman and any other person the presumption is that she takes the part acquired by her, as tenant in common, unless a different intention is expressed in the instrument; except, that when any of such property is acquired by husband and wife by an instrument in which they are described as husband and wife, unless a different intention is expressed in the instrument, the presumption is that such property is the community property of said husband and wife. The presumptions in this section mentioned are conclusive in favor of any person dealing in good faith and for a valuable consideration with such married woman or her legal representatives or successors in interest, and regardless of any change in her marital status after acquisition of said property. * * *↩
3. Cal. Civil Code, Sec. 158 (West 154), specifically recognizes the right of husband and wife to enter into contracts stating: Husband and wife may make contracts. Either husband or wife may enter into any engagement or transaction with the other, or with any other person, respecting property, which either might if unmarried; subject, in transactions between themselves, to the general rules which control the actions of persons occupying confidential relations with each other, as defined by the Title on Trusts. (Enacted 1872.) Cal. Civil Code, Sec. 159 (West 1954), provides as follows: Contracts; property; separation A husband and wife cannot, by any contract with each other, alter their legal relations, except as to property, and except that they may agree, in writing, to an immediate separation, and may make provision for the support of either of them and of their children during such separation. (Enacted 1872. As amended Code Am. 1873-74, c. 612, p. 193, Sec. 36.) The California courts have construed this section to require not only the agreement to separate but also the provisions for support to be in writing signed by both parties. Fitch v. Tyler, 105 C.A. 306, 288 P. 74 (1930), and McLaughlin v. McLaughlin, 141 Cal. App. 2d 494, 296 P. 2d 878 (1956). There is language in the latter case which might be interpreted to require also that after separation a property settlement agreement must be in writing signed by both parties (296 P. 2d at 880). However, we do not so interpret this language since the case deals only with support payments and relies solely on Fitch v. Tyler, supra, which was specifically limited to support payments. Also, In re Patterson's Estate, 46 C.A. 415, 189 P. 483↩ (1920), which the Court in Fitch v. Tyler distinguishes, holds that such a property settlement agreement need not be in writing. In the instant case respondent does not contend that petitioner's claimed agreement with Stettner was required to be in writing to be valid but merely that we should not accept the testimony of petitioner and Stettner. Therefore, we have no issue in the instant case with respect to whether the agreement was required to be in writing.
4. Respondent in his brief cites Anne Goyne Mitchell, 51 T.C. 641 (1969), reversed - F. 2d - (C.A. 5, June 23, 1970); Carmen Ramos, T.C. Memo. 1969-157, reversed - F. 2d - (C.A. 5, July 13, 1970); and Paul Cavanaugh, 42 B.T.A. 1037 (1940), affirmed 125 F. 2d 366↩ (C.A. 9, 1942), for the proposition that each spouse in a community property state has a duty to report one-half of the community income even though one of the spouses has no knowledge of or benefit from the community income or property. The reversals were after the filing of respondent's brief and we have no opinions filed after these reversals. Since we have concluded that the income here involved was not community income, we do not reach the question of whether in our view our holding or that of the Court of Appeals is correct, or whether our holding in Paul Cavanaugh is controlling for California cases whether or not there exists any conflict between the affirmance of our Cavanaugh case by the Court of Appeals for the Ninth Circuit and the reversal of our Mitchell and Ramos cases by the Court of Appeals for the Fifth Circuit.